

Christine D. Haynes
302-651-7508
Haynes@rlf.com

January 31, 2018

**VIA CM/ECF E-FILING AND HAND DELIVERY**

The Honorable Richard G. Andrews
United States District Court
844 North King Street, Unit 9, Room 6325
Wilmington, DE 19801

> Re:   *TQ Delta, LLC vs. 2Wire,* et al.*,* C.A. Nos. 13-cv-1835-RGA, -2013-RGA, 14-cv-954-RGA, and 15-cv-121-RGA

Dear Judge Andrews:

      Non-Party Broadcom Corporation ("Broadcom") submits this letter to correct the record with respect to statements made by TQ Delta ("TQD") to the Court at a recent hearing. Specifically, Broadcom understands that TQD told the Court on January 10, 2018, that:

> "[T]here are some issues with respect to [Broadcom] depositions. Robins Kaplan takes the deposition of Broadcom about the code, and they can't— ***Broadcom is now reneging*** on it [the promise of depositions] and not allowing us to break up the depositions.  And so far, Broadcom wants us to do one deposition for all the families at one time.  And, so, if we can't depose the technical people on the code, we can't really do final infringement contentions.  So, it's [the Broadcom depositions] in a state of flux."[1]  (D.I. 463 at 137:25138:9, emphasis added);[2] and

> "The reason why [TQD has not provided final infringement contentions] is – my understanding is, delays in production of the proper technical documents [from Broadcom].… The process [of negotiating with Broadcom] is going a lot slower, your Honor.  And the big problem is, they have some codes.  ***Broadcom is now fighting hardware codes.***  And that is a big issue for some of the families."  (D.I. 463 at 137:15-24, emphasis added.)

      These statements are factually incorrect, wrongly cast Broadcom in a negative light, and should not be the basis for the extension of the discovery schedule and TQD's time to take discovery from Non-Party Broadcom.  Therefore, even though the disputes between Non-Party Broadcom and TQD are subject to the jurisdiction of the Central District of California, rather than this Court, Broadcom has no choice but to write to set the record straight.

---

[1]   To his credit, TQD's counsel later said that he "might" be wrong that Broadcom had "reneged," D.I. 463 at 139:5-6.

[2]   All docket citations are to C.A. 13-1835-RGA.

The Honorable Richard G. Andrews
January 31, 2018
Page 2

1. **Broadcom Has Timely Discussed TQD's Recent Deposition Requests And Has Not "Reneged" On Any Promises**

    Broadcom has not "reneged" on any agreements regarding depositions. Indeed, to date, TQD has not even served a deposition subpoena on Broadcom. Broadcom and TQD have had only the barest beginnings of negotiations regarding deposition topics and structure—and they have done so on timing driven by TQD.

    On December 11, 2017, TQD wrote to Broadcom for the first time about depositions, stating that it wanted to "open a discussion" regarding depositions it wished to take in the future. Ex. A at 1. TQD proposed for the first time in its letter a particular division of deposition topics, which it later explained were split by patent family. *See id.*; Ex. C at 1. Broadcom's engineers, however, are not organized by patent family, so its division of topics did not make sense.

    Broadcom promptly called TQD on December 14th (a date suggested in TQD's letter) to discuss these issues, but TQD's counsel was unavailable. He emailed to say that he would try to call Broadcom back on December 15th or 19th. *See* Ex. B at 1. TQD did not do so, however. Instead, TQD did not call back until the holidays had intervened, meaning that Broadcom's counsel was no longer available. Broadcom and TQD therefore first conferred on January 3rd. *See* Ex. C at 2. On the call, Broadcom explained why TQD's proposed division of deposition topics does not make sense for Broadcom. *See id.* at 1. Broadcom suggested that, depending on the final topics, it was possible that a single witness could cover all topics, ***but Broadcom needed TQD to provide information about the parts of the firmware code on which it seeks testimony*** so that it could see if this approach would work, as different engineers work on different parts of the code. *See id.* Notably, Broadcom followed up with TQD on January 12th by email to again request this information about TQD's proposed topics. *Id*. TQD did not respond to Broadcom's email, other than to indicate that it expected to provide this information by January 19th. *See id*.

    Although TQD's pre-holiday letter suggested a January date for an initial deposition, TQD did not send further information about the requested deposition until ***late yesterday***, January 31st (and still, TQD did not propose a deposition date, saying it does "not have an immediate view on the timing for depositions"). Ex. G. Broadcom is evaluating the information now provided (which still does not seem to provide all the information requested), but—in short—Broadcom has not "reneged" on any supposed agreement. Broadcom has also not caused any delay in deposition scheduling. TQD itself has driven the timing of its requests.

2. **Broadcom Promptly Agreed To Produce Hardware Code When Asked, Even Though It Is Irrelevant**

    As with many technology companies, Broadcom's source code is amongst its most precious assets. Nevertheless, Broadcom long ago agreed to make its firmware code available for inspection by TQD—and then did make it available for inspection at an escrow facility. That code has been available for review for over four months now—since September 2017.

    Initially, TQD prioritized firmware over other types of code (such as hardware code) because of its (correct) assessment that functionalities relevant to the asserted patents would be

The Honorable Richard G. Andrews
January 31, 2018
Page 3

programmed by firmware. Nevertheless, it reserved the right to request hardware code later, and Broadcom agreed that it would later produce that code if TQD had a legitimate need for it. Ex. D at 5. Three months passed with no code requests from TQD. Then—on the day after Christmas, when Broadcom was closed for the holidays and weeks after the original fact discovery deadline in the 2Wire case had passed—TQD sent a letter to Broadcom, now demanding that Broadcom produce hardware code. Ex. E. It gave no explanation as to why TQD supposedly needs the hardware code or why it could seek that code after the close of fact discovery in the 2Wire case.

TQD's letter asked Broadcom to confer with TQD during the first week of January. Broadcom did exactly as TQD requested. During the ensuing conference, Broadcom asked TQD to explain why the hardware code was needed in light of the complete firmware source code and tens of thousands of pages of technical documents that have been produced or made available. Ex. D at 5. TQD could not answer that question on the call, and it did not provide the requested information until January 11th—after the date that TQD had already told this Court that Broadcom was "fighting" the production of hardware code. On the 11th, TQD sent a letter stating that the hardware code was needed because it thought that certain relevant functionalities—identified in the letter—were performed in the hardware. *See* Ex. F at 3-6.

Within a week, Broadcom had researched the identified functionalities with its engineers and learned that TQD was mistaken. All of the functionalities identified in the January 11th letter are programmed in the firmware that has now been available to TQD for four months.

Broadcom explained TQD's mistake to it. Ex. D at 5. Nevertheless, TQD informed Broadcom that it would move to compel the hardware code anyway. Given the expense of another motion[3] and the challenge for a magistrate judge of resolving the technical issue of where functionalities are implemented in source code, Broadcom agreed to give TQD the requested hardware code for chips with the functions identified by TQD, despite its irrelevance to this case, so long as TQD bears the expense of the escrow, does not burden Broadcom with an unnecessary deposition on irrelevant code, complies with the Protective Order, and agrees to some reasonable cut-off for its seriatim requests for code (as TQ Delta has already since indicated it will have some unknown number of additional, future hardware code requests). Ex. D at 1, 2.

In short, TQD's statement on January 10th that Broadcom had refused to provide hardware code was not correct then and is not correct now. On January 10th, TQD had barely made its request, had not given any reason as to why it supposedly needed the hardware code, and had not received an answer either way from Broadcom. And, now, Broadcom has agreed to provide the requested code. In short, TQD's description to the Court of the status of the discovery was and is wrong—and Broadcom should not be blamed for any delays of the schedule in this case.

---

[3] This would be TQD's fourth motion to compel involving Broadcom, with the three so far having all failed. TQD has needlessly increased Broadcom's costs for these motions by, for instance, submitting unfounded expert declarations. In this instance, it would be expensive for Broadcom to refute (or difficult for a judge to evaluate in the context of a motion to compel) baseless and contested opinions about the technical functionalities in particular firmware and RTL, regardless of how incorrect that TQ Delta is.

RLF1 18825154v.1

The Honorable Richard G. Andrews
January 31, 2018
Page 4

                                                  Respectfully,

                                                  */s/ Christine D. Haynes*

                                                  Christine D. Haynes (#4697)

cc:    Counsel of Record (via CM/ECF)